May it please the Court, Stephanie Grace on behalf of Petitioner on Ko-Ko. If I could reserve two minutes of time for rebuttal. Okay. Your Honors, we believe there are multiple grounds for reversing the Immigration Judge's decision in this case, but the clearest of which is that the use of the bond hearing testimony. We believe that under Joseph v. Holder, this Court has held that 8 CFR 1003.19d precludes the Immigration Judge from using any evidence during a bond hearing at a subsequent removal proceeding. Does it make any difference that apparently this particular I.J. was presiding over the bond hearing? No, Your Honor. In fact, in Joseph v. Holder, it was the same Immigration Judge who was presiding over both. As the regulation states, the bond hearing shall be separate and apart from and shall form no part of any subsequent removal proceeding. This was the language that the Court in Joseph v. Holder was interpreting and, in fact, emphasized shall form no part. The reasoning for its holding was clear. Bond hearing proceedings are far less formal than the immigration proceedings. They are often not under oath. They are not reported. There is no transcript of it. So there is no record of what actually transpired at the bond hearing. Okay. Let's go with you then for purposes of argument that the date that he gave during the bond hearing as to when he left the country is wrong. What then? What happens? Assuming that he misspoke at the bond hearing, I don't think that that testimony could come in at the removal hearing. No, I understand that. So the testimony is out. So now what happens? So that cannot constitute substantial evidence that would support an adverse credibility determination. I got that. So the question is, so what do we do with the case once we conclude that that is not part of the record? Well, then it's a clear error as a matter of law, which means this Court should remand to the BIA to decide the case. But does it make a difference that in his testimony he conceded or admitted that the date, I mean, that's separate and apart from the bond hearing. At the actual hearing, he said that the date was wrong. Correct. I don't think that that makes a difference, because if it can't form a part of the asylum proceeding, then I don't think it can be used as a basis for cross-examination either. And it's always the case that if an immigration judge wants to use inconsistencies as a basis for an adverse credibility determination, the immigration judge needs to ask about it and to get the explanation for it. But that wasn't the ground on which Joseph V. Holder found the use of the bond hearing notes to be improper. It was improper because those proceedings shall form no part of the subsequent proceeding, not because the petitioner in that case was not given an opportunity to explain the discrepancy. And so I think here, too, it was essentially the government attorney had cross-examined him saying, do you remember that you stated you left on June 16, 1996? So essentially the government attorney was representing to the petitioner that he had said something different in an earlier proceeding. And my client responded, I remember I misspoke. And at that point, the immigration judge had jumped in and asked him to – if he admitted that he had said something different at the two proceedings. And at that point, he said that he didn't really remember. In this case, there's no recording of what actually happened, and that's the fundamental problem. Kagan. Well, the difference is that the I.J. was actually – had a recollection of what happened, right? I don't think so, Your Honor. You don't think so? In Joseph V. Holder, it's true that the immigration judge was using her bond hearing notes, but it also presumably did not comport with her recollection. And so, I mean, in this case, it's actually more disconcerting of a violation because we have no contemporaneous record of what actually happened at the bond hearing. At least in Joseph V. Holder, there were some contemporaneous notes from which the immigration judge could try to refresh her recollection or some basis. In that case, was the immigration judge the same judge who had presided over the hearing? Yes. As I read – the government is perfectly free to step in on this one, but as I read the part of the transcript where the judge is asking your client, so you admit that at the prior hearing you told me you'd left Burma in 1996. I look at his answers, and I don't find him saying, I admit I said this. He said, well, the hearing was over there. Well, did you or did you not say? And then he answers, at this point, I don't remember. Exactly. So he doesn't say, I said that. He does not admit that. Thank you, Your Honor. Yes. Well, in that part of the colloquy, the immigration judge doesn't say he recalls it. Exactly. The portion of who is recalling it is the government attorney. Correct. There's no evidence in the record that the judge even had an independent recollection of what happened at the bond hearing. Now, speaking as a judge, and maybe the immigration judge has a better memory than I do, I can't remember what happened last month. Of course. And this had happened four months earlier. It was not recorded. The petitioner appeared telephonically through an interpreter, and because there was no transcription, he had no opportunity to correct any misstatements. It could have been recorded improperly. It could have been interpreted improperly. Okay, so let me come back to where I was before. One possible resolution is we simply send it back to this I.J. saying, okay, you cannot rely on anything that might or might not have been said at the bond hearing. Are you asking for anything more than that? That is to say, are you asking that on this record we say, you know, he's credible? We are. We do believe. So make that argument for me, because that's a harder argument. It is, Your Honor. So in this case, we believe that he's entitled to a presumption of credibility on remand and that he should be deemed credible, because this, essentially, this minor inconsistency was the essence of the adverse credibility determination. And as this Court held in Sotomayor v. Holder, where it's clear that the immigration judge is sort of cherry-picking minor trivial inconsistencies and is straining to find reasons and excuses to deny a Petitioner's asylum claim, in those cases it is appropriate to remand and instruct that he be deemed credible. Now, that goes way beyond Joseph, right? Yes. That was not addressed. No, this is why I'm asking this as a separate question. So what were the grounds upon which the IJ found no credibility? We believe that the discrepancy in dates, and the immigration judge stated in his oral opinion that this was the essence of the issue of credibility, was the discrepancy in dates. There was nothing else cited. He goes on later on. Well, apparently he also said, and I use the word apparently somewhat carefully, he also said to the immigration officer when he shows up, there's some sort of a hearing at which he also says the earlier 1990 date. Is that right? There was, right, the airport interview. Right. And so what am I supposed to do with that evidence? So the immigration judge. Is that disregarded also? Exactly. The immigration judge himself admitted that it was unreliable under the circumstances. Again, that was ordered. So that's out. Exactly. Because the immigration judge doesn't pay any attention to it. Precisely. There was some issue of some documentary evidence that was submitted. But essentially, the immigration judge's opinion said there's this discrepancy in dates between the bond hearing and this proceeding. Therefore, there's issues about credibility, and I would require further corroborating evidence. And then in evaluating the corroborating evidence, he noted why he didn't feel that that corroborating evidence was sufficient. And that's with respect to the letter from the monk and the date at which the birth certificate had been corrected. Correct. But those did not go to Petitioner's credibility. By the immigration judge's own decision, those were merely about the adequacy of the corroborating evidence in light of the fact that there was that particular incident. And if we were to conclude that the IJ has misunderstood what that letter was from the monk in its relation to the correction of the birth certificate, is there anything else left that supports the IJ's finding of lack of credibility? I don't think so, Your Honor. Okay. And I noticed in your 28J letter you say that there was no adverse credibility finding. Now, in his oral opinion, there seems to meet not to be one. On the other hand, as part of the same proceeding, before he says, and I will now deliver my opinion, he very clearly states, I don't believe him. Correct. So isn't that enough to say that that's actually an adverse credibility finding? I don't think so, Your Honor. The REAL ID Act requires that there be an explicit adverse credibility finding. Further, I'm going to beat up on you on this one, in the appeal from the IJ to the BIA, he says that there's an adverse credibility finding. That's true, Your Honor. Yeah, yeah. So I think you're stuck with that. Let's hear from the other side. You've used up all your time, but we will make sure to give you something in rebuttal. Thank you. Good morning. May it please the Court. My name is Lauren Bassett, and I represent the respondent, the United States Attorney General. In this case, the record does not compel the conclusion that the petitioner presented a credible claim. Here, the immigration judge had several specific and articulate reasons for not  The most important that's been discussed so far is that the immigration judge discrepancy in the date given at the bond hearing. So what do you do with Joseph? So Joseph, several reasons why it's different. First of all, Joseph is a pre-REAL ID Act case. So at that point And bond hearings are more reliable after the REAL ID Act? It has nothing to do with that. It's that the REAL ID Act put into the statute that the immigration judge can consider any relevant factor, any relevant evidence. They can consider an applicant's oral statements, whenever made, and whether or not under oath, considering the circumstances under which they're made, and compare that. And any of those can go toward the credibility determination. And do we have any evidence here that he made that statement that we can Any else reliable evidence that the judge can look at that he made that statement? Yes, Your Honor. What's that evidence? So I will admit his testimony is vague and unclear, which is another part of the problem. I don't think it's vague and unclear at all. He says, I don't remember. No, he does say, yes, I remember now. This is on the record at 157. The judge says, do you remember saying you left Burma on June 13, 1996? He says, yes, I remember now. I also like to say that at the time Wait a minute. So where are we? I'm on page 150. What page are we supposed to be on? 157, Your Honor. Okay. What line are we on? We are the fourth line. Answer, yes, I remember that now. I also like to say that at the time I had spoken wrong. And then he says, I don't remember now on line 17. Yes. Then he goes on, says, well, I think I couldn't hear the interpreter. And then he said, and that's also on 157. And through that to the next page, he says, well, I'm more at peace now. I know what to say now. But at that hearing, my attorney wasn't present. Okay. And then the judge says, well, your attorney was there. And then he said, oh, well, maybe at the time I hadn't paid him fully yet. So, yes, he does, first of all, admit he said it. And second, he now says He admits it and then he says, I don't remember. So I don't know which one we believe. Well, and that's the fundamental problem with this case. The immigration judge is left not to know what to believe. And, therefore, there's no way this record could compel a reasonable fact finder to say that he presented a credible claim, because there are so many questions. If we were to read Joseph as saying and applying to this case in a post-real ID act environment, that the I.J. can't rely on it, that's simply off the table, then what? I will answer that. I do want to say I'd like to go back and say that I don't think the Court should do that. I understand that. But there are other reasons. I'm not asking you to concede. But assuming for purposes of argument or purposes of this question, Joseph tells us that the I.J. is not entitled to look at whatever might or might not have been said in the bond hearing. So there are other discrepancies that the immigration judge specifically cited. There was an issue of the petitioner's height on his citizenship card. That card indicated that he was 5'6". The petitioner is clearly 6' tall. He admitted to being 6'. That's a 6-inch height difference. This is not a 1 or 2-inch. He said he'd been at least 6 feet tall for the past 12 years. That would be backing up to 1995. What is the significance of that? Is that he's not who he says he is? It could go to identity, but also it's the way he responds to discrepancy that leaves the immigration judge still confused. Because when asked, he said, well, I don't know, it could have been an error. I made the card when I was 16 or 17. Did he say he made the card? When he went to get the card. I'm sorry. Because that may be very different. Yes, you're right. When he went to get the card at the office, he said he went when he was probably 16 or 17. Right. And how many go 12 years back from the time he testifies? What age is that? That puts it at 1995. He went to get the card in 1994. However, in 1994, he would have been 21. So the immigration judge said, he said, I got it at 16 or 17. The judge said, well, the card is dated 1994, so you would have been 21. To which he doesn't respond directly to that issue. No, but there's something. I don't have the precise page reference. But apparently, the information upon which these cards are based is given earlier in time. That is to say, the card was prepared in 1994, but the information on which the card is based was not necessarily provided in 1994. It might have been provided somewhat earlier. Is that right? Am I wrong about that? That's unclear to me, Your Honor. The card itself is at 248, but the testimony about it is between 146 and 151. And he, at one point, says something about going to get identification perhaps when he was younger. But if we go to 151. So the judge says, you were not 5'6". Yes, Your Honor, that's correct. He says he wasn't 5'6". It could have been an error. When I have to register, I have to do this when I'm 16 or 17. That's when the registration was made. But then the judge said, well, the card was issued in 94, and you were 21.  He says, well, you were not 5'6". He doesn't answer. What page are you reading from? I'm sorry. 151 at the top, Your Honor. 151. Yeah, okay. Hang on. And at that point, he doesn't answer that question. He just says something about comparing thumbprints. Yes. So he's so the one possible construction of this is that he gave the information when he was 16 or 17, and the card is issued four or five years later, at which point, and he might have grown in the intervening period. At least that's a possibility. I'm not sure. That could be a possibility. I don't even think that is what happened. But regardless, this, again, goes back to the judge doesn't know what to believe, which is, again, a problem. The burden is on the petitioner to present his asylum claim. Apparently, was his thumbprint on this identity card? He says something about thumbprints. Unfortunately, the photocopy is really terrible, and the judge doesn't get into the thumbprint issue. But the other problem with the identity card, the citizenship card, and the birth certificate then goes to his ethnicity. And his birth certificate says he's Karen Chinese. His asylum application lists Karen Chinese. Then his citizenship card says Burmese. And when he is asked about this discrepancy, this, again, becomes the problem with the answers. The judge says, why does it say you're Burmese on the citizenship card? And he said, well, listing Burmese is often easier.  And he said, well, there are a lot of people there. Everybody was there. I don't know how that happened. And then when further asked, he says, well, I don't differentiate ethnicities. And then he said, the judge asked, do you claim to be Karen? And he says, yes, I do claim to be Karen, but I don't give it much significance. But, of course, his application is not based on his ethnicity, is it? I thought it was based on his political activity. Correct. He checked political activity and membership in a particular social group. He doesn't check ethnicity. He lists his ethnicity as Karen Chinese. He talks about his mother being persecuted. So what difference does it make? What difference does it make? It might, I don't know how we do things in this country. People could consider themselves all Americans, and then they might consider themselves Asian Americans or Korean Americans or whatever. What difference does that make? Sure. Well, the difference, again, this could go to identity, but the difference here is also that there is, in fact, a difference, and the judge doesn't find his explanation clear, basically. He's not persuaded by the explanation of the differences in the document. And under the Real ID Act, it does not have to go to the heart of the claim. Correct, Your Honor. And the judge can consider the totality of the circumstances. And back to the initial question, I can continue. There are other reasons the judge gave for the adverse credibility finding. Next, there was significant problems with the timing and implication of the help in the letter from the monk. So Petitioner says, testifies, that he contacted the monk, Yu Theola, and that that monk went to his village and collected the documents and then sent them to the petitioner. The judge specifically says this letter in the record at Exhibit 5 is from that monk, and he says yes. But as I read that letter, it may well be that that letter is from the same monk. But I read the letter, and the letter says nothing about, I'm hereby transmitting documents. Well, exactly. No, no, exactly. That means even though that letter looks as though it's processed after the corrections to the birth certificate, well, if that letter was not the letter that transmitted the documents, the date on that letter is totally irrelevant. Well, no, the immigration judge didn't see it that way. I know he didn't see it that way, but it seems to me obvious as you read that letter that it is not a transmittal letter. I mean, there is not a word in that letter. The judge doesn't think it was the letter that came with the documents. That's the whole point. The judge thought that the letter was not the letter that transmitted the documents, contrary to what he testified. Exactly. And the other problem is that the letter itself, what it says is, I just heard from your friends and family about your situation. I'm reaching out to you to see if you need my help. I would be happy to help go get the documents or send messages back and forth between you and your family for safety reasons. So that implies this is the monk's first time reaching out to a petitioner that it's their initial contact. That's what the judge said. This letter implies initial contact, and it is completely contradicted by a petitioner saying, I called this monk and he did all these things for me and he sent the documents. If the documents arrived on May 11th in the United States, but the letter from this monk implying first communication is the last postmark is May 13th, there's no possible way that those two stories can go together. So that was another problem that the immigration judge had. I think the problem is, if there is a problem, it's not that this letter transmitted the documents and it came in later. It's that this letter didn't transmit the documents. The documents had to be transmitted in some other way. Yes, Your Honor. And I see my time is up, but I want to just say the other two. I don't mean to interrupt you, and I hope Judge Fletcher will give you a question. We'll talk as long as we need to talk to get this case. I have two questions. First, do we actually deport people to Myanmar or is it now Burma again? Do we actually deport people there? I believe so. I'd have to check with DHS. I know that each individual, it's a matter of when we get the travel documents, but there's no standing rule that we do not. And what about the corroborating evidence, particularly the scars on his head, his shin, his thigh, as well as his broken wrist and thumb from the torture that he claimed he underwent? Well, while the immigration judge doesn't go into detail about that, the scars he mentioned that they were in the testimony, the judge acknowledges them. But the problem is, I don't know what they're from. He acknowledges, yes, you have a scar on your head. Yes, your thumb doesn't bend as far as the other thumb. But the nature of the immigration judge not believing this claim and thinking back to the bond testimony, he could maybe have not even been in Burma from 1996 to 2006 when a lot of these things happened, is why the immigration judge found that he can't believe the claim. But certain things happened before 1996, but I grant you that other things happened. Some things did, but the immigration judge overall decided that he had not presented enough credible testimony and evidence to find credibility in this case. And then the agency did not go on to decide whether the harm rose to persecution because they found he wasn't telling the truth. Here's one way to look at this case, and I'm somewhat sympathetic in a way with I.J.'s suspicions here. I mean, the story that he tells is some pretty terrible things that happened to him up through the mid-'90s. Then, according to his story, he stays in Myanmar. He stays in Burma. And then what prompts him to finally believe is, by comparison, a pretty innocuous episode where he goes to this cooperative about the rice and so on, and they're drunk, and somebody falls over and so on. And then he says he leaves. It seems to me, if I just think about ordinary human behavior, that it would have been more likely that he would have left Burma in 1996 after all this stuff happened rather than sticking around and then having this be ten years later being the triggering episode for him leaving. So I understand why there's some reason why the I.J. is skeptical of this. Sure. What if he had testified, and this is not what he testified to, what if he had testified, you know, I did this, or rather, I experienced this, I went to Singapore in 1996, I lived more or less illegally because I couldn't get status in Singapore. I went back to Burma a couple of times, but I finally came to this country, and I'm now claiming asylum based on what happened to me prior to 1996. Would he have had a good asylum claim? Well, I know this isn't an answer you're going to like, but the immigration judge and the board would have to consider that in the first instance because that would be totally different facts than this case. But I'm trying to figure out what's going on here because there's something a little squirrely about this, and I'm trying to figure out if he is lying about the date on which he left Burma. Why is he lying about the date he left Burma? Because it seems to me plausible that if all of this stuff happened to him before 1996, he can't be held to have been permanently resettled in Singapore if he can't get status in Singapore. I mean, is he just getting bad legal advice in terms of the story he's telling? Well, I don't know, unfortunately. I can't tell you. But, you know, and again, the immigration judge would have to look in the first instance. But if he had gone to Singapore and couldn't get status but also then went back to Burma, that might undercut the reality of well-founded fear. And I'm making up that he might have gone back to Burma. Right. I'm making up that he went to Singapore. Well, exactly. Because that was not his testimony. His testimony is to the contrary. Right. Yes, Your Honor. Okay. In comparison to the testimony in the bond hearing where he does say that he left in 1996.  because in that case it was the immigration judge's notes. And there was no attorney. And there was no interpreter. You say there are immigration judge notes? In Joseph, the immigration judge relied on his own personal notes. Okay. And the court's issue in that case was the fact that they were the immigration judge's notes. And the court specifically distinguished as saying this was not the applicant's oral statements or a witness's oral statements. Well, here we don't even have notes as far as we can tell. Well, right. But we have an oral statement. And while the transcript's not in the record, he then, as the judge mentioned before, is asked about it at the hearing. And as we reviewed, he says, yes, I remember now. And then he says a moment later, I don't remember. Correct. And he also had his attorney at that bond hearing and an interpreter at that bond hearing. So the informality that was discussed in Joseph is different. And Judge Graber concurred in that opinion that there could be situations where bond hearing evidence could be used. Got it. Okay. Okay. Well, there are other reasons that the immigration judge also found to support the adverse credibility issue with when he was running and whether there was a gunshot fired or whether he just fell down. There was issues with whether a letter was sent to summon his father to the committee hearing or whether a person came. And all of these things added up. And we consider the totality of these circumstances. The immigration judge's decision, adverse credibility determination, is supported by substantial record evidence here and should not be overturned. And most importantly, there's nothing in this record that compels the conclusion that the petitioner presented a credible claim. Okay. Thank you, Your Honors. Thank you. Let's have some rebuttal. Let's give you two minutes and see what happens. Thank you, Your Honors. So it is our position that the immigration judge's opinion in this case had one basis for the adverse credibility determination, and that was the discrepancy in dates. These other inconsistencies may have been mentioned, but I don't think that they formed part of the immigration judge's decision. And in any event, they would not constitute substantial evidence that would support an adverse credibility determination. But would an opposite conclusion be compelled based on the record? Yes. I mean, those are two sides of the same coin for the legal standard. So it must be supported by substantial evidence, and if it's not supported by substantial evidence, then the record compels a fine of credibility. That's my understanding, at least. As to the height issue, the petitioner explained that the card was issued when he was 16 or 17, that he was required to get a card at that age, that the photograph reflected him at that age, and that at that age he was 5'6". Why the card was reissued in 1994, we don't know. But the immigration judge was not obligated to accept that explanation. Well, I think that whether or not he was obligated to accept that explanation does not mean that that alone would constitute substantial evidence that would support an adverse credibility determination. Why not? If an explanation is given for discrepancy and the immigration judge is not required to accept that explanation, then why wouldn't that constitute substantial evidence to support the adverse credibility determination? Because it is a totality of the circumstances test under the Real ID Act, and although any inconsistency can be considered, it's a different inquiry whether those inconsistencies would constitute substantial evidence. So as this Court explained in Shrestha v. Holder, the immigration judge cannot cherry-pick manifestly trivial inconsistencies. Is that trivial? His identity? And if the identification card doesn't match his fiscal characteristics, why would that be trivial? I think in the context of this case where there was the written I-589 application that documented several incidences of torture and abuse in detail, and his over 100 pages of oral testimony lined up with that, and we have significant corroborating evidence. We have the physical scars. We have... None of that matters if it's not credible. Well, Your Honor, I think in the totality of the circumstances... In this Court's holding in Shrestha v. Holder, if you say that any inconsistency cannot constitute substantial evidence, then that necessarily means that you need to look at the record as a whole. And looking at the record as a whole, I do think that it compels a finding that Petitioner was credible. As the government admits in footnote 15 of its brief that this may have been a bureaucratic error and that the date was not, in fact, 1994, that it might have been issued earlier or it might have been some kind of error on the card itself. I mean, under the Real ID Act, the Ninth Circuit and appeals still have an obligation to review and make sure that there's substantial evidence. My driver's license says that I weigh 175 pounds, and that was once true. Exactly. And my driver's license has been reissued several times after that has ceased to be true. Thank you. Okay. Well, but you're not applying for asylum, fortunately. Yeah. Well, I mean, I think the immigration judge in this case, this was not a basis of the adverse credibility determination anyway. The immigration judge based the adverse credibility determination solely on the discrepancy between the bond hearing testimony, which should not have come in, and the asylum proceedings. I mean, the other things that are mentioned in passing, the immigration judge doesn't even expressly state that that's the basis of this finding. Okay.        Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.
judges: Korman, Fletcher, Rawlinson